## STATE OF CONNECTICUT *v.* JEROME JANUSZEWSKI

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued April 8—decision released August 19, 1980

*Ronald E. Cassidento,* with whom, on the brief, was *Allen Marko,* law student intern, for the appellant (defendant).

*D. Michael Hurley,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant has appealed from his conviction of possession with the intent to sell of one kilogram or more of a cannabis-type substance in violation of General Statutes § 19-480a (b) and possession of four ounces or more of a cannabis-type substance in violation of § 19-481 (b). On appeal, the defendant raises five claims of error: Three are directed to the court's

rulings on motions to suppress certain evidence; one is directed to the court's decision to quash the defendant's subpoena directed to the contents of the arresting officer's personnel file; and the last is directed to the court's instructions to the jury relating to the burden of proof. We discuss the facts of the case as they relate to each of these claims.

I

Two of the motions to suppress challenged the admissibility of a total of fifty-eight pounds of marijuana taken from the vehicle that the defendant was in control of at the time of his arrest on the ground that the vehicle itself was unlawfully seized. In a third motion to suppress the defendant claimed that an inculpatory statement made by him concededly before he was informed of his *Miranda* rights was inadmissible because it was obtained in violation of the fifth amendment to the United States constitution. The court's memorandum of decision on two of these motions, read in the light of other undisputed facts,[1] discloses the following: On April 29, 1977, at approximately 3:30 p.m., Trooper Michael Cope of the state police was traveling southbound on route 12 in Preston when he noticed a Cadillac parked next to a motorcycle in a commuter parking lot. Both vehicles were facing route 12. When the trooper noticed two people in the front seat of the Cadillac, he decided to turn into the parking lot. As he did so, he observed the person, later identified as Bruce Kenyon, who was seated in the passenger seat of the Cadillac, drop

[1] This court is hampered in its review of decisions of the trial court that depend upon the resolution of factual matters where the factual basis of the court's decision does not appear in a transcript filed with this court or in a written memorandum of decision under Practice Book, 1978, § 3060B.

down from the front seat and crawl out of the door and under the motorcycle parked next to the automobile. Seeing this patently furtive conduct, the trooper blocked the Cadillac by parking in front of it and proceeded to investigate the matter. As he did so, the person seated in the driver's seat locked the passenger door of the vehicle, exited from the driver's door and then locked that door. Cope soon recognized the person who had exited from the driver's seat as Jerome Januszewski, the defendant, who the trooper knew had been previously arrested and convicted of a drug-related offense. When Cope asked the defendant and the person who was with him what they were doing there, no explanation was given and the defendant became hyperactive and nervous. Cope then noticed a green garbage bag on the floor of the front seat of the Cadillac, and requested permission of the defendant to examine the contents. When this permission was denied, Cope returned to the police vehicle to check the automobile registration and identification of the defendant and the person with him, who, evidently, was the operator of the motorcycle. While Cope was in his vehicle he also called on his police radio for his supervisor and Trooper John Herman, both of whom were familiar with the defendant and his drug-related activity. During the time that Cope was in the police vehicle, the defendant and the person with him wandered freely around the parking lot until the defendant approached the police vehicle and asked Cope if they could speak together. Cope testified at the suppression hearing that the defendant then entered the police vehicle and stated: " 'Look Mike, you got me, but let me go and I'll work for you,' or words to that effect. [State's Attorney]: Did you reply to that? [Trooper Cope]: Yes,

sir. I stated, 'How much grass?' That was it. Meaning, how much grass was in the bag, or in the car, or in the garbage bag. [State's Attorney]: Did he answer that question? [Trooper Cope]: Yes, sir. He stated, 'Ten big ones.' [State's Attorney]: What does that mean, or what do you understand that to mean through previous experience, training on the streets, 'ten big ones'? [Trooper Cope]: Ten pounds."

Shortly after this exchange, the substance of which the defendant does not dispute, Sergeant Stuyniski arrived on the scene and the defendant was arrested. When the officers requested the keys to the Cadillac from the defendant, he responded by saying that he did not have them. When Stuyniski indicated that if the defendant did not surrender the keys the automobile might be damaged as a result of the police gaining entry forcibly, the defendant gave the officer the keys. The officers then entered the vehicle and removed from the front seat the green trash bag, in which they discovered ten individual ziplock plastic bags containing a substance later identified as marijuana. Contrary to the statement in the defendant's brief, the police did not search the trunk of the Cadillac at this time. Instead, the officers transported the Cadillac to the state police barracks and obtained a search warrant to search the trunk. On doing so, the officers discovered forty-eight ziplock plastic bags, each of which contained one pound of a substance later identified as marijuana.

## A

We turn first to the defendant's claim that his automobile was seized in violation of the fourth amendment to the United States constitution. In

this portion of the defendant's argument he claims that Cope's action in blocking the Cadillac upon his entrance into the parking lot constituted a seizure of the automobile and that this seizure was unreasonable under the fourth amendment.

There is no question but that, on the facts of this case, Cope temporarily detained the Cadillac that was under the defendant's control and, at least constructively, the defendant himself by his conduct in blocking the automobile. This initial detention was for investigatory purposes and did not constitute an actual arrest of the person or complete seizure of the automobile. It was a sufficient restraint on the liberty of the defendant, however, to implicate the defendant's right under the fourth amendment to the United States constitution to be secure in his person and effects against "unreasonable searches and seizures." U.S. Const., amend. IV; *Delaware* v. *Prouse,* 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *United States* v. *Martinez-Fuerte,* 428 U.S. 543, 556–58, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976); *United States* v. *Brignoni-Ponce,* 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); *Terry* v. *Ohio,* 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In *Davis* v. *Mississippi,* 394 U.S. 721, 726–27, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969), the United States Supreme Court stated: "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'"

That does not mean, of course, that the police can never detain a person or his property without

probable cause to arrest or to seize.[2] The Supreme Court expressly rejected that contention in *Terry* v. *Ohio,* supra, 20–22; see 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.1 (d); and specifically with respect to investigative stops of automobiles, in *Adams* v. *Williams,* 407 U.S. 143, 145–46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972), and *United States* v. *Brignoni-Ponce,* supra, 880. The fourth amendment was never intended to shackle the police by preventing their use of reasonable efforts to both detect and prevent crime. The fourth amendment prohibition is against *"unreasonable* searches and seizures." (Emphasis added.) The question presented, then, is whether under all the circumstances Cope's conduct in detaining the defendant and the vehicle the defendant was operating was reasonable under the fourth amendment. *Delaware* v. *Prouse,* supra, 653–54; *Terry* v. *Ohio,* supra, 20.

There is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails. *Camara* v. *Municipal Court,* 387 U.S. 523, 536–37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). The test to be applied, however, is an objective one: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry* v. *Ohio,* supra, 22. In justifying the particular intrusion "the police officer must be able to point to

---

[2] It is clear that police action that is necessarily swift because it is predicated upon the on-the-spot observations of the police historically has not been, and as a practical matter could not be, subject to the fourth amendment's warrant requirement. *Terry* v. *Ohio,* 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio*, supra, 21; see *United States* v. *Brignoni-Ponce*, supra, 834; *State* v. *Watson*, 165 Conn. 577, 585, 345 A.2d 532 (1973). While general investigation may be based upon suspicion and guesswork, a police officer's decision to restrain a person's liberty or the use of his property must be made on more than a mere hunch. See *Delaware* v. *Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *Terry* v. *Ohio*, supra, 22; *Beck* v. *Ohio*, 379 U.S. 89, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); *State* v. *Watson*, supra, 585. The specific facts that form the basis of the stop also limit the scope of the officer's actions following the stop. *United States* v. *Brignoni-Ponce*, supra, 881; *Terry* v. *Ohio*, supra, 19–20. "The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." *State* v. *Watson*, supra, 585.

We apply these considerations to the present case. The trooper's observation of two persons in the front seat of an automobile parked in a commuter parking lot at a time when the owners of such vehicles are customarily at work was sufficient to arouse some degree of reasonable suspicion. The plainly furtive conduct of the occupants of that vehicle observed by the officer as he approached certainly justified the limited intrusion upon the defendant's personal liberty and his liberty to move the automobile. These were "specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."[3] *Terry* v. *Ohio,* supra, 21. When the defendant exited and locked the vehicle and was recognized by the officer as someone who had previously been arrested and convicted of a drug offense, the officer was warranted in questioning him about his activities. Upon receiving an unsatisfactory answer and observing the green plastic garbage bag that the defendant had locked inside the vehicle, the officer was also warranted in restraining the Cadillac while investigating further and seeking back-up assistance. It should be pointed out that the actual restraint on the defendant's liberty was minimal. He was allowed to wander freely about the parking lot with Kenyon as the trooper remained in his patrol car. The trooper's conduct in blocking the Cadillac served only to maintain the status quo momentarily while he obtained more information and assistance. See *Adams* v. *Williams,* 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972).[4] The restriction upon the defendant's liberty was by no means unreasonable or excessive in view of the surrounding circumstances.[5] The court did not err

---

[3] Contrary to the defendant's argument, the case of *Delaware* v. *Prouse,* 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), is inapposite. In *Prouse,* the officer stopped an automobile in motion on a public highway to check the operator's license and automobile registration although he had neither probable cause to believe, nor reasonable suspicion, that the automobile was being driven in violation of some particular law or that either the automobile or its occupants was subject to seizure or detention in connection with the violation of any applicable law. Id.

[4] The propriety of such stops is recognized by the Model Code of Pre-Arraignment Procedure § 110.2 (1) (a).

[5] Compare the facts of this case with those of *United States* v. *Strickler,* 490 F.2d 378 (9th Cir. 1974). In *Strickler,* the police, after observing a car drop off a person at a location where a narcotics delivery was expected to take place, converged upon the sus-

in not excluding evidence of the marijuana seized from the Cadillac on this ground.[6]

## B

The defendant next claims that the search of the riding compartment of the Cadillac shortly after his arrest violated the fourth amendment and that the court erred in denying his motion to suppress the evidence obtained as a result of that search. He reasons that because there was no actual threat that the automobile could be moved there were no exigent circumstances permitting an exception to the fourth amendment warrant requirement and that, as a consequence, the police were obliged to seize the automobile until such time as they could procure a warrant to search it.

It is a basic principle of constitutional law that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment —subject only to a few specifically established and

pect car with three squad cars: one at the front, one at the rear and one at the side of the suspect's car so as to prevent any movement. The police then exited from their cars and, at gunpoint, ordered the occupants of the suspect car to raise their hands. The court ruled that this restriction of the occupants' liberty constituted an arrest and not the limited intrusion of a "stop and frisk." It also concluded that, there being no probable cause to arrest the suspects, the arrest violated the fourth amendment.

[6] Although the defendant's brief does not distinguish between the evidence seized from within the riding compartment of the Cadillac and that seized from the trunk, the record demonstrates that the marijuana in the trunk, as noted above, was seized at the state police barracks pursuant to a search warrant, which was not disputed by the defendant in his reply brief or at oral argument. Because the defendant does not question the validity of the search warrant and the search conducted pursuant thereto, we are concerned only with the court's refusal to suppress the marijuana seized from within the riding compartment shortly after the defendant was arrested.

well-delineated exceptions." (Emphasis added.) *Katz* v. *United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see *Coolidge* v. *New Hampshire,* 403 U.S. 443, 455–56, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). The fourth amendment's requirement that a warrant issue from a neutral and detached judicial officer "rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities." *Trupiano* v. *United States,* 334 U.S. 699, 705, 68 S. Ct. 1229, 92 L. Ed. 1663 (1948). As we have already observed, however, the fourth amendment proscribes only "unreasonable searches and seizures," and there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers. Thus, where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved; see *Chimel* v. *California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) (harm to police officer); *Warden* v. *Hayden,* 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967) (hot pursuit of escaped suspect); or the likelihood of evidence being destroyed or removed from the grasp of law enforcement officers; see *Schmerber* v. *California,* 384 U.S. 757, 770–73, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966); a warrant will not be required.

In *Carroll* v. *United States,* 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925), the Supreme Court, for the first time, applied the exigency doctrine to automobile searches based on probable cause but conducted without a warrant. In sustaining the constitutionality of the National Prohibition Act; 41 Stat. 305, 315 (1919); which authorized such

searches, the court stated that it would not be "practicable to secure a warrant because the vehicle [could] be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll* v. *United States,* supra, 153.[7] After its decision in *Carroll,* the court had occasion to clarify and refine the exigency doctrine as it applies to searches of automobiles. In *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), the court sustained the constitutionality of a warrantless search of an automobile at the police station on the ground that the exigency that existed earlier at the time of seizure justified the later intrusion. In *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), a sharply divided court declared that the warrantless search of an arrested defendant's automobile, which was parked in a private driveway, violated the fourth amendment where the police had ample opportunity to obtain a valid warrant. The court pointed out that the vehicle contained no contraband or stolen goods but was being seized for investigative purposes; nor was there any indication that any confederates of the defendant had been alerted so as to create the threat of the automobile's removal. Id., 472.

---

[7] Since the court's decision in *Carroll* v. *United States,* 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925), it has considered reasonable the warrantless searches of automobiles absent exigent circumstances where (1) the search was incident to a valid arrest; *Adams* v. *Williams,* 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *Preston* v. *United States,* 376 U.S. 364, 367, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964) (dicta); (2) the search was based on consent; *Lewis* v. *United States,* 385 U.S. 206, 210, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966); (3) the search was conducted to inventory the contents of an impounded vehicle; *Cooper* v. *California,* 386 U.S. 58, 87 S. Ct. 788, 17 L. Ed. 2d 730 (1967); and (4) the search was one of items in plain view. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465-68, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (dicta).

Although the court's opinion in *Coolidge* suggested the adoption of an exigency exception to the warrant requirement based upon the actual or threatened mobility of the motor vehicle, the court's later decisions on the subject have dispelled that suggestion. In *Cardwell* v. *Lewis,* 417 U.S. 583, 94 S. Ct. 2464, 41 L. Ed. 2d 325 (1974), the court acknowledged the constitutional authority of the police, given probable cause to seize an automobile parked in a public parking lot and to later "search"[8] the vehicle at the station house without a warrant. Although probable cause may have existed for enough time prior to Lewis' arrest for the police to obtain a warrant, the court did not regard this fact as dispositive of the issue. The court stated: "Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. . . . The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." Id., 595–96. The court also noted that its decision was based upon the fact that "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects." Id., 590.

More recently, the court has identified more clearly two reasons for the distinction between searches of motor vehicles and searches of build-

---

[8] Actually, the interior of the automobile in *Cardwell* was never searched; the search was limited to an examination of a tire on one of the wheels and the taking of paint scrapings from the exterior. *Cardwell* v. *Lewis,* 417 U.S. 583, 592, 94 S. Ct. 2464, 41 L. Ed. 2d 325 (1974).

ings or other repositories of personal effects. "First, the *inherent mobility* of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. *Carroll* v. *United States,* [supra, 153–54]; *Coolidge* v. *New Hampshire,* [supra, 459–60]. But the Court has also upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction. *Chambers* v. *Maroney,* [supra, 51–52]; *Cooper* v. *California,* 386 U.S. 58 [, 87 S. Ct. 788, 17 L. Ed. 2d 730] (1967). Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." (Emphasis added.) *South Dakota* v. *Opperman,* 428 U.S. 364, 367, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976);[9] see also *United States* v. *Alden,* 576 F.2d 772 (8th Cir. 1978); *Commonwealth* v. *Holzer,* 480 Pa. 93, 389 A.2d 101 (1978); note, 87 Harv. L. Rev. 835.

These decisions make clear that the actual or threatened mobility of an automobile is not dispositive of whether the fourth amendment requires the police to obtain a warrant prior to conducting a search of the automobile. It is because an automobile is, usually, inherently mobile and, thus, presents a continuing possibility of being moved and because a person's expectation of privacy in an automobile is significantly less than one's expectation of

---

[9] In *South Dakota* v. *Opperman,* 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976), the Supreme Court approved the constitutional validity of a standard inventory search of an automobile that was towed to a police impound lot after being illegally parked in a restricted parking zone.

privacy in his home, office or other similar places, that resort to the judicial process prior to the search of an automobile is often not required.

Whatever may be the circumstances in which a search warrant would be required before the search of an automobile, they certainly are not presented here. The defendant does not dispute that there was probable cause to search the contents of the Cadillac. Not only was the Cadillac inherently mobile, that is, capable of self-propulsion, but it was parked on easily accessible property open to the public. See *Cardwell* v. *Lewis,* supra, 593; compare *Coolidge* v. *New Hampshire,* supra. Moreover, the Cadillac, which was neither owned by, nor registered in the name of, the defendant, could have been moved by its owner or a confederate of the defendant and its contents forever lost had the police not at a minimum seized it at the time of the defendant's arrest. Where the police have a right at least to immobilize the vehicle, the Supreme Court has stated that "there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." *Chambers* v. *Maroney,* 399 U.S. 42, 52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), quoted in *Cardwell* v. *Lewis,* supra, 594.[10] We conclude that the seizure and search of the defendant's vehicle at the commuter parking lot did

[10] The warrantless search of the Cadillac cannot be justified as being incident to a lawful arrest under *Preston* v. *United States,* 376 U.S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964), and *Adams* v. *Williams,* 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). Searches incident to an arrest of the person may be conducted without a warrant only to remove possible weapons that the arrested person might use to resist or escape or to seize evidence that the *arrested person* might otherwise conceal or destroy. *Chimel* v. *California,* 395 U.S. 752, 762–63, 89 S. Ct. 2034, 23 L. Ed. 2d 685

not violate the fourth amendment to the United States constitution and that the court did not err in refusing to suppress evidence obtained in the course of that search.[11]

## C

The defendant also claims that the court erred in refusing to suppress the inculpatory statements made by him to Cope after the defendant entered the police vehicle. The defendant argues that the conversation between himself and Cope constituted "custodial interrogation" and that Cope's failure to advise him of his rights under *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to the conversation required the suppression of the inculpatory statements. We disagree.

Before one suspected in the commission of a crime is entitled to the warnings constitutionally required by *Miranda* two conditions must be satis-

(1969). Thus, such a search is limited to the arrestee's "person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Id., 763; see *State* v. *Runkles,* 174 Conn. 405, 411–12, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978); 2 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.1 (b). The defendant was arrested outside of the Cadillac, the doors of which were closed and locked.

[11] The defendant's argument that the search of the plastic bag in the front seat without a warrant violated the fourth amendment under the Supreme Court's holdings in *United States* v. *Chadwick,* 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977), and *Arkansas* v. *Sanders,* 442 U.S. 753, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), is unavailing. There is no indication that the defendant exhibited a greater expectation of privacy in the green garbage bag than he did in the interior of the automobile generally. Unlike the locked footlocker found in the trunk of Chadwick's automobile and the closed suitcase found in the trunk of the taxicab Sanders was riding in, the green garbage bag here was apparently not even tied closed.

fied: the suspect must be in police custody; *Oregon* v. *Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Beckwith* v. *United States,* 425 U.S. 341, 344–48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); see *State* v. *Singleton,* 174 Conn. 112, 115, 384 A.2d 334 (1977); and the suspect must be subjected to interrogation. *Rhode Island* v. *Innis,* 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *Miranda* v. *Arizona,* supra, 444; *State* v. *Ferrara,* 176 Conn. 508, 519, 408 A.2d 265 (1979). The term "custodial interrogation" encompasses both of these requirements, and was defined by the *Miranda* court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[12] Id., 444. What constitutes police custody for purposes of the *Miranda* warnings is not always self-evident. One thing is clear: the *Miranda* court was concerned with interrogation that takes place in a police dominated environment containing "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona,* supra, 467; see also id., 445, 458; *Beckwith* v. *United States,* supra, 346–47. The *Miranda* court concluded that "[i]n each of the cases [joined in the appeal], the defendant was thrust into an unfamiliar atmosphere and run

---

[12] Although the *Miranda* court's use of the disjunctive "or" suggests that a person may be deprived of his freedom of action in any significant way and yet not be "in custody," the language of *Oregon* v. *Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), quoted later in this opinion makes it clear that the deprivation of the suspect's freedom of action must rise to the level of "custody." See note, 45 Fordham L. Rev. 1222, 1229–32; see also *Oregon* v. *Mathiason,* supra, 500 (Stevens, J., dissenting).

through menacing police interrogation procedures." Id., 457. Although the location of the particular interrogation is not controlling and one may be in custody in his own home; see *Orozco* v. *Texas,* 394 U.S. 324, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969); the Supreme Court has unequivocally stated that the fact that police questioning takes place in a "coercive environment" is not enough to trigger the application of *Miranda.* "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon* v. *Mathiason,* supra, 495.

We do not believe that the facts establish that the defendant was in custody when he entered the police cruiser and began to converse with Cope. Although it is true that the defendant was the subject of what would have been, absent his inculpatory statements, a temporary investigative stop and was, thus, detained, such temporary and limited restraint on an individual's liberty can hardly rise to the level of "custody" under *Miranda* in the circumstances presented here. Were such routine investigatory stops deemed to place the person detained and ques-

tioned in custody, then police officers would be required to inform motorists stopped for minor traffic violations of their *Miranda* rights prior to asking any questions simply because during the period the officer is checking out the driver's license and the automobile's registration, the driver may not be permitted to leave the scene. In *State* v. *Smith,* 174 Conn. 118, 384 A.2d 347 (1977), we upheld the constitutionality of police questioning of the defendant during the time immediately following a fatal automobile accident out of which his arrest for misconduct with a motor vehicle later arose. Although the defendant's liberty was somewhat restrained during the investigatory operations of the police at the scene, and it became evident to the police officer that the defendant was probably intoxicated and, therefore, criminally responsible for the homicide, we concluded that the questions put to the defendant that elicited his incriminating responses did not constitute "custodial interrogation." Id., 121.

That is not to say that the absence of a *formal* arrest precludes the existence of custody for *Miranda* purposes. "Precisely when an arrest occurs is a question of fact which depends on an evaluation of all the surrounding circumstances. *Sibron* v. *New York,* 392 U.S. 40, 67, 88 S. Ct. 1889, 20 L. Ed. 2d 917 [1968]; *Rios* v. *United States,* 364 U.S. 253, 261–62, 80 S. Ct. 1431, 4 L. Ed. 2d 1688 [1960]." *State* v. *Love,* 169 Conn. 596, 600, 363 A.2d 1035 (1975). The presence or absence of a formal declaration that the suspect is under arrest is not dispositive of the question. See *Dunaway* v. *New York,* 442 U.S. 200, 212, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *State* v. *Derrico,* 181 Conn. 151, 159,

434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). "To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained." *United States* v. *Grandi,* 424 F.2d 399, 401 (2d Cir. 1970), quoting *Jenkins* v. *United States,* 161 F.2d 99, 101 (10th Cir. 1947).

An application of these considerations to this case makes it apparent that the defendant had neither been actually nor constructively arrested at the time he entered the police cruiser. Indeed, Cope did not have probable cause to arrest the defendant until the defendant inculpated himself in the police cruiser. Up until that time, the defendant was allowed to wander freely with Kenyon around the parking lot while the trooper was occupied in the police cruiser, certainly not a customary practice for someone "in custody." When the defendant asked to speak with Cope, entered the vehicle and then initiated the conversation that followed, it could hardly be said that he had been subjected to an environment of "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona,* supra, 467. In fact, the statement made by the defendant in which he implicitly acknowledged guilt of a possessory drug offense was entirely volunteered. Such statements "cannot be considered the product of 'custodial interrogation' requiring *Miranda* warnings." Annot., 31 A.L.R.3d 565, 581; see *United States* v. *Sanchez,* 449 F.2d 204, 209 (5th Cir. 1971); *State* v. *Ferrara,* 176 Conn. 508, 521, 408 A.2d 265 (1979). The question asked by the officer relating to the amount of marijuana the defendant

had acknowledged he then possessed only served to make more specific the defendant's voluntary and somewhat ambiguous statement.

We conclude that the defendant was not in custody at the time he made inculpatory statements to Cope and, therefore, that *Miranda* was not applicable.[13] Where the defendant is not entitled to *Miranda* warnings but nonetheless makes inculpatory statements to the police that are sought to be introduced at his trial, the question becomes whether, in the light of all the circumstances, the inculpatory statements were voluntarily made. See *Beckwith* v. *United States,* supra, 347–48. All of the surrounding circumstances, including the duration and conditions of the detention, the attitude of the police, and all the factors affecting the defendant's power of self-control are pertinent to whether his statements were the result of a free and unconstrained choice, in other words, were truly voluntary. *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). Our review of this case in the light of these factors leads us to but one conclusion: the trial court's implicit determination that the defendant's statements were voluntarily made and were not the product of another's will was not erroneous.

## II

We turn now to the defendant's claim that the court erred in its instructions to the jury on the

---

[13] Because we have concluded that the defendant was not in custody and was, therefore, not entitled to *Miranda* warnings, we need not consider whether the question asked of the defendant by Cope constituted "interrogation." The United States Supreme Court recently defined "interrogation" for purposes of *Miranda* in *Rhode Island* v. *Innis,* 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

issue of drug dependency.[14]  The defendant claims that, under General Statutes § 19-480a (b),[15] the fact that the accused was not drug dependent at the time of the alleged offense is an essential element of the offense, and that the state bears the burden of proving this element beyond a reasonable doubt.  The state counters by asserting that the accused's status as a drug-dependent person at the time of the offense is an exception from the statute's prohibition and that, by operation of General Statutes § 19-474,[16] the initial burden of producing evidence

[14] Although the defendant frames this issue as the court's failure to charge the jury as requested by him on the matter of drug dependency, he has failed to include in his brief the language of the requested instruction as our rules require.  Practice Book, 1978, § 3060F (c) (1).  Because the claim is fully briefed by the parties, the error claimed is of fundamental constitutional dimensions—relating as it does to the burden of proof of an alleged essential element of the offense—and the court has a duty, even absent a proper request to charge, to instruct the jury adequately and correctly on the governing principles of law, we review the claim as presented.  See State v. Evans, 165 Conn. 61, 70, 327 A.2d 576 (1973).

[15] General Statutes § 19-480a (b) provides:  "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other then marihuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[16] General Statutes § 19-474 provides:  "In any complaint, information or indictment, and in any action or proceeding brought for the

at trial of drug dependency rested upon the defendant. The trial court concluded that under § 19-480a (b) drug dependency was an exception to or an exemption from the general prohibition in that statute and that General Statutes § 19-474 had the effect of placing the burden on the defendant to produce some evidence that he was a drug-dependent person at the time of the alleged offense. The court was careful in the instructions given to comply with this court's interpretation of § 19-474 in *State* v. *Brown*, 163 Conn. 52, 301 A.2d 547 (1972).[17] In *Brown* we

---

enforcement of any provision of this part, it shall not be necessary to negative any exception, excuse, proviso or exemption contained in said section, and the burden of proof of any such exception, excuse, proviso or exemption shall be upon the defendant."

[17] The court's instruction in this regard provided: "[T]he state must prove beyond a reasonable doubt that the sixth element is that the person is not a drug-dependent person. 'Drug dependence' means a state of physical or psychic dependence, or both, upon a controlled substance following administration of that substance upon a repeated periodic or continuous basis. However, the state excepts from drug-dependency anybody who is under drug treatment at that time on the basis of a medical series of treatments. The state must prove this . . . that he is not a drug-dependent person . . . beyond a reasonable doubt. However, the state, because this is an excuse or an exception to this statute, . . . in other words, because . . . if the person is drug-dependent, he cannot be found guilty under this statute, 19-474, which states that in any complaint, information . . . this, what I read to you, is an information . . . or indictment, in any other action or proceeding brought for the enforcement of any provision of this part, it shall not be necessary to negative any exception, excuse, proviso or exemption contained in said section, and that the burden of proof of any such exception, excuse, proviso or exemption shall be upon the defendant. What the state is saying is that because this element is an excuse or exempts you from having to commit the crime, the burden of going forward shifts to the defendant. The state still has the ultimate burden of proving beyond a reasonable doubt, but some evidence has to come in from the defendant showing that he meets this exception or excuse. So I charge you on the element of drug dependency as follows: Now, although it is true that the burden of proving an accused is not drug dependent is upon the state, it is also true that because most men are not drug dependent or most men are not drug addicts, the law presumes that

said that, while the defendant bears the initial burden of producing "substantial evidence"[18] of the applicability of an exception, upon doing so the language of General Statutes § 19-474 loses all operative effect and the burden then devolves upon the state to prove the nonapplicability of the exception, as with all other essential elements in the case, beyond a reasonable doubt. Id., 66–67.

The question dispositive of this issue is whether the fact that the defendant is not drug dependent at the time of the offense is an essential element of the crime charged upon which the state bears the initial and ultimate burden of proof. This question is one of first impression. Whether the existence of some fact is an essential element of a crime depends upon whether the existence of that fact forms a part of the conduct prohibited by the statute; that is, whether the fact in question is part of the corpus delicti. See *State* v. *Beauton,* 170 Conn. 234, 241, 365 A.2d 1105 (1976). General Statutes § 19-480a (b) provides in pertinent part: "Any person who . . . possesses with the intent to sell . . . one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years . . . ." We

an accused was not drug dependent at the time of the incident on which the charge is based unless there is some credible evidence introduced tending to prove to the contrary. There was no such evidence of drug dependency introduced in this case, so you may safely assume, if you so choose, that the accused was not drug dependent."

[18] The term "substantial" as used here goes to the quality of the evidence and not to the quantity of evidence. Thus, there is no contradiction in stating that the defendant is required to produce some, albeit substantial, evidence of the applicability of the exception.

conclude that the defendant's status as a person who is not drug-dependent is not an essential element of the offense charged. It is not a part of the prohibited conduct, i.e., the possession of a certain quantity of a narcotic substance with intent to sell. Unlike the situation presented in *State* v. *Beauton,* 170 Conn. 234, 242, 365 A.2d 1105 (1976), there is no general right in this state to possess narcotic substances; indeed, possession of such substances is permitted only in carefully delineated circumstances.[19] See generally General Statutes, c. 359.

General Statutes § 19-474 places the burden of proving the existence of any "exception, excuse, proviso or *exemption*" contained in the provisions of chapter 359 upon the defendant. It is clear from a reading of General Statutes § 19-480a (b) that persons who are at the time of the offense drug dependent are exempted from the operation of the statute. Thus, examination of the language of both General Statutes §§ 19-474 and 19-480a (b) leads to the conclusion that the burden of producing evidence of drug dependency rests initially upon the defendant. It was just such an exemption from the operation of the prohibiting statute to which § 19-474 was designed to apply.

The defendant claims, however, that because the clause relating to the absence of drug dependency does not begin with the word "provided" or "except," or some similar expression, the burden is upon the state to prove the nonexistence of this status. General Statutes § 19-474 creates no such

[19] In *Beauton,* which involved the question of whether the state bore the burden of proving that the defendant did not have a permit to carry a revolver, we said: "In Connecticut, there is no blanket prohibition against carrying or possessing a pistol." *State* v. *Beauton,* 170 Conn. 234, 242, 365 A.2d 1105 (1976).

requirement, and it would raise form over substance to impose one. The clear meaning of the clause relating to the absence of drug dependency is to exempt a particular class of persons from the operation of the statute.[20]

Not only does the language of § 19-474 place the burden of producing some substantial evidence of drug dependency upon the defendant, logic does as well. It is generally recognized that the state bears no initial burden of proof on matters personal to the defendant and peculiarly within his own knowledge. See 153 A.L.R. 1218, 1251–54; 29 Am. Jur. 2d, Evidence §§ 153, 154. A defendant's drug dependency at the specific point of time in the past at which the offense occurred is certainly a matter personal to the defendant and peculiarly within his own knowledge. Moreover, the enactment of § 19-474 appears to be an implicit recognition by the legislature of the difficulty created when any party is given the burden of proving the nonexistence of a certain fact, especially where, as in this case, that fact is the nonexistence of a physical status of the defendant at one, usually distant, point prior in time.[21] See 29 Am. Jur. 2d, Evidence § 153.

Placing upon the defendant the burden of proving the existence of a physical state of being that removes him from the operation of a penal statute is not unusual in this jurisdiction or in others.

[20] We need not examine the legislative history of General Statutes § 19-480a (b), as the defendant suggests, inasmuch as we find no ambiguity in the language employed by the legislature. See *Robinson* v. *Unemployment Security Board of Review*, 181 Conn. 1, 9, 434 A.2d 293 (1980).

[21] It should be noted in this regard that occasionally the arrest and usually the prosecution of a criminal defendant takes place a substantial amount of time after the alleged criminal conduct took place.

Under General Statutes § 53a-13, a defendant in any criminal prosecution is required to assume the burden of proving that, as a result of a mental disease or defect, he lacked the requisite mental capacity to commit the offense, or simply stated, that he was insane. Like our construction of General Statutes § 19-474, we have said concerning General Statutes § 53a-13 that "[t]he state has a right, in the first instance, to rely on the presumption that the defendant was sane at the time of the offenses alleged in the . . . [information] . . ." and that the defendant bears the burden of producing substantial evidence tending to prove insanity. *State* v. *Rossier,* 175 Conn. 204, 209, 397 A.2d 110 (1978), quoting *State* v. *Davis,* 158 Conn. 341, 355, 260 A.2d 587 (1969). When the defendant produces such evidence, the presumption of sanity loses all operative effect and the state bears the burden of proving beyond a reasonable doubt that the defendant was sane at the time of the alleged offense. Ibid. Likewise, in any prosecution for murder, the burden of proving that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse rests upon the defendant. General Statutes § 53a-54a (a). The constitutionality of allocating to the defendant the burden of proof on this mitigating factor is without doubt after the Supreme Court's decision in *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). Similarly, this court has already held and has later reiterated that the allocation of the burden of proof made by General Statutes § 19-474 does not violate the due process clause of the United States constitution.[22] See *State* v.

---

[22] In *State* v. *Brown,* 163 Conn. 52, 67, 301 A.2d 547 (1972), we said: "Of course, the provisions of § 19-474 would not be constitu-

*Clark,* 164 Conn. 224, 229, 319 A.2d 398 (1973); *State* v. *Brown,* 163 Conn. 52, 301 A.2d 547 (1972). We hold that under General Statutes § 19-480a (b) the state has the right in the first instance to rely on the language of § 19-474 that "it shall not be necessary to negative any exception, excuse, proviso or exemption contained in" the section, such as the defendant's status as a drug-dependent person at the time of the offense. Should the defendant thereafter introduce some substantial evidence tending to prove his drug dependency at the time of the offense, the matter of his drug dependency becomes an issue in the case, § 19-474 then loses all operative effect and "the burden rests on the state, as it does in all other essential elements in the case, to prove beyond a reasonable doubt that the accused was not entitled to the benefit of [the] excuse, proviso or exemption claimed by him." *State* v. *Brown,* supra, 67.[23] We conclude that the court did not err in the instruction given.

---

tionally sound if the statute operated in any situation in which it caused the defendant any hardship; *Morrison* v. *California,* 291 U.S. 82, 88, 54 S. Ct. 281, 78 L. Ed. 644 [1934] . . . ." It is clear that in this case placing upon the defendant the burden of producing some substantial evidence of his drug dependency at the time of the offense does not cause the defendant any hardship.

[23] To the extent that the trial court's instructions, reproduced in part in footnote 17, supra, suggest that the absence of drug dependency is an element of the crime charged, those instructions are technically incorrect. It would be more accurate to say that, like the issue of insanity, upon the defendant's introduction of some substantial evidence tending to prove his drug dependency at the time of the offense, the matter of the defendant's status as a person who is not drug dependent becomes an issue in the case upon which the state bears the ultimate burden of proof. In view of the practical equivalence of the instruction given and the fact that the defendant concededly introduced no evidence of drug dependency, the court's choice of terms is of no consequence in this case.

## III

We take up now the defendant's claim that the court erred in quashing the subpoena issued by the defendant for the personnel records of Cope. The subpoena was issued to the Connecticut state police personnel department and was properly served and returned. In his brief, the defendant states that the purpose of the subpoena was to allow him to inspect Cope's personnel file in order to verify knowledge, based on information and belief, that Cope had been the subject of various disciplinary actions prior to the incident giving rise to this prosecution. The state moved to quash the subpoena because under Public Acts 1977, No. 77-609, now codified as General Statutes § 1-15 et seq. and known as the Freedom of Information Act, personnel files are exempt from disclosure as public records. See General Statutes § 1-19 (b) (2). The defendant suggested at the trial that the court make an inspection of the file in camera but the court refused to do so. In refusing to allow the defendant to gain access to Cope's personnel file, the court relied on the confidentiality of such records and indicated that the defendant had other methods of impeaching Cope's credibility. The court also intimated that such a file would not be admissible to impeach the witness if he denied any prior acts of misconduct that might be recorded therein because it would involve a collateral matter.

The general rule under the Freedom of Information Act favors disclosure and exceptions to that rule will be narrowly construed in the light of the

underlying purpose of the act.[24]   See *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 329, 435 A.2d 353 (1980).   We are not here presented with the question of the general public's right to certain information, however, which is the subject of the Freedom of Information Act. Through the Freedom of Information Act, the legislature has sought to balance the public's right to know and the private needs for confidentiality. See *Wilson* v. *Freedom of Information Commission,* supra, 328 n.2. Instead, the defendant's request in this case implicates a more significant right, the right of a criminal defendant to impeach the witnesses who testify against him.   See *State* v. *Rodriquez,* 180 Conn. 382, 391-94, 429 A.2d 919 (1980); *State* v. *Mahmood,* 158 Conn. 536, 540, 265 A.2d 83 (1969).   It is this right of a particular defendant that must be weighed in the balance that determines whether information, otherwise exempt under the act, must nevertheless be disclosed.

The competing interests here are both weighty and legitimate.   There are strong policy reasons for maintaining the confidentiality of personnel files of the type involved in this case.   See, e.g., *People* v. *Coleman,* 75 Misc. 2d 1090, 349 N.Y.S.2d 298 (1973).   Generally, a trial court has some discretion in the matter of discovery where material is sought for impeachment purposes.   See *Shores* v. *United States,* 174 F.2d 838 (8th Cir. 1949); 11 A.L.R.2d 635.   Other jurisdictions have recognized that in the exercise of that discretion the trial court must weigh the defendant's need to examine confidential matter for the purpose of discovering impeaching material

[24] We believe this rule applies by analogy here even though technically a public agency is not the one resisting disclosure of information under the Freedom of Information Act.

against the public policy in favor of the confidentiality of private and personal information. See *United States* v. *Iozia,* 13 F.R.D. 335 (S.D. N.Y. 1952); *Commonwealth* v. *Dominico,* 1 Mass. App. Ct. 693, 306 N.E.2d 835 (1974); *People* v. *Coleman,* supra. We subscribe to this approach.

The disclosure of such information must be carefully tailored to a legitimate and demonstrated need for such information in any given case. Where disclosure of the personnel file would place in the hands of a defendant irrelevant or personal and sensitive information concerning the witness, the entire file should not be disclosed. No criminal defendant has the right to conduct a general "fishing expedition" into the personnel records of a police officer. Any request for information that does not directly relate to legitimate issues that may arise in the course of the criminal prosecution ought to be denied. In recognizing the danger of permitting the disclosure of personnel records of any witness or litigant, one court has said: "It has been widely noted that such records often contain raw data, uncorroborated complaints, and other information which may or may not be true but may be embarrassing, although entirely irrelevant to any issue in the case, even as to credibility." *People* v. *Sumpter,* 75 Misc. 2d 55, 60, 347 N.Y.S.2d 670 (1973). Because discovery of matters contained in a police officer's personnel file involves careful discrimination between material that relates to the issues involved and that which is irrelevant to those issues, the judicial authority should exercise its discretion in determining what matters shall be disclosed. An in camera inspection of the documents involved, therefore, will under most circumstances be neces-

sary. See *United States* v. *Nixon,* 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974); *Commonwealth* v. *Dominico,* supra; *People* v. *Bottom,* 76 Misc. 2d 525, 351 N.Y.S.2d 328 (1974). We reemphasize that, in resolving requests for disclosure, routine access to personnel files is not to be had. Requests for information should be specific and should set forth the issue in the case to which the personnel information sought will relate. The trial court should make available to the defendant only information that it concludes is clearly material and relevant to the issue involved. See *People* v. *Fraiser,* 75 Misc. 2d 756, 757, 348 N.Y.S.2d 529 (1973) (subpoena duces tecum issued for personnel files of police witnesses in prosecution for possession and sale of controlled drugs). In this regard, the trial court should exercise its discretion in deciding the temporal relevancy or remoteness of material sought. Cf. *State* v. *Carbone,* 172 Conn. 242, 262, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *State* v. *Mahmood,* 158 Conn. 536, 540, 265 A.2d 83 (1969); *State* v. *Towles,* 155 Conn. 516, 523–24, 235 A.2d 639 (1967) (relating to the introduction of evidence at trial); see also 1 Wharton, Criminal Evidence (12th Ed.) § 151. Because the law furnishes no precise or universal test of relevancy, the question must be determined on a case by case basis according to the teachings of reason and judicial experience. See *State* v. *Jones,* 166 Conn. 620, 624, 353 A.2d 764 (1974); *Pope Foundation, Inc.* v. *New York, N.H. & H. R. Co.,* 106 Conn. 423, 435–36, 138 A. 444 (1927).

It seems to us that in this case, where the defendant's right to impeach the state's key witness is involved, an in camera inspection by the trial judge of the witness' personnel file for material relevant

to the issue of credibility would have been appropriate. The trial court's refusal to do so constituted error.[25]

Our conclusion that there was error, however, does not end the matter. We must determine whether the error was so prejudicial to the rights of the defendant as to deprive him of a fair trial, and so, to constitute harmful error. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980); *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976). The defendant does not argue that this claim involves the violation of a constitutional right and, therefore, the burden rests upon him to demonstrate the harmfulness of the error. See *State* v. *Ruth,* supra; *State* v. *Pepe,* 176 Conn. 75, 81, 405 A.2d 51 (1978); cf. *Chapman* v. *California,* 386 U.S. 18, 24, 26, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

We have determined that the error was harmless. That conclusion rests upon several factors. The defendant had other avenues available to him to impeach the credibility of Cope. He could have called witnesses to testify to Cope's reputation for truth and veracity. He could have cross-examined Cope concerning any prior disciplinary proceedings that related to his truth and veracity, and he makes

[25] We are not here presented with the admissibility of portions of a personnel file at trial. It is well to remember in this regard that while the right of cross-examination is fundamental in a criminal trial; see *State* v. *Luzzi,* 147 Conn. 40, 46–47, 156 A.2d 505 (1959); it is, as Wigmore states, "no universal solvent for reducing everything to admissibility." 3A Wigmore, Evidence (3d Ed.) § 878. See *United States* v. *Iozia,* 13 F.R.D. 335, 338 (S.D. N.Y. 1952); see also 2 Wharton, Criminal Procedure (12th Ed.) § 382. Moreover, we have said that impeaching a witness on a collateral matter by the use of extrinsic evidence is not allowed. *State* v. *Carbone,* 172 Conn. 242, 262, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *Hirsch* v. *Vegiard,* 137 Conn. 302, 304, 77 A.2d 85 (1950).

no claim that he was denied that right. He could have deposed Cope or his superiors prior to trial. He could have filed and pressed motions for discovery prior to trial. Any one or more of these opportunities were available to the defendant notwithstanding the court's ruling to quash the subpoena. Significantly, the defendant failed to pursue, or failed to claim that he was denied the right to pursue, any of them.

The most significant factor leading to the conclusion that the error was harmless is that Cope's credibility was not crucial in this case. The defendant never directly or indirectly attacked the factual basis giving rise to this prosecution. He did not file an alibi defense. The only evidence presented by the defendant was the testimony of the owner of the Cadillac, Raymond Ruszala. By his testimony, the defendant sought to have the jury believe that Ruszala had loaned the Cadillac to Kenyon in order for Kenyon to decide whether he would buy it from Ruszala and that Kenyon, who decided not to purchase the car, was delivering it to the defendant on the date of the arrest so that the defendant could, in turn, give the car back to Ruszala. The evidence presented, thus, suggested that although the defendant was arrested while in control of a vehicle containing marijuana, that marijuana was not his but Kenyon's.[26] Therefore, the objective underlying facts upon which the prosecution depended were not in dispute, only the interpretation to be accorded those facts. We conclude, therefore, that the error was harmless to the defendant.

There is no error.

In this opinion the other judges concurred.

---

[26] Kenyon was deceased at the time of trial.