STATE OF CONNECTICUT *v.* JAMES SCULLY

STATE OF CONNECTICUT *v.* ALEXANDER TAYLOR
(11711)
(11712)

PETERS, C. J., HEALEY, SHEA, ASPELL and BRENNAN, Js.

Argued January 11—decision released April 16, 1985

*Scott J. Murphy,* assistant state's attorney, for the appellant (state).

*Arthur P. Meisler,* for the appellees (defendants).

ARTHUR H. HEALEY, J. The state has appealed from the granting by the trial court, *Conway, J.,* of both defendants' motions for the suppression and return of property seized from them by the state police. These appeals present the question whether under the circumstances of this case the officers involved could constitutionally make a valid warrantless investigatory stop of these defendants in their automobile. We hold they could not and affirm the trial court's suppression and return of the property seized and the dismissal of the informations.

On October 10, 1981, the Ku Klux Klan (Klan) held a rally in the town of Windham. A counterdemonstration, which included a march from Willimantic to Windham, was also held that day. This march was organized by the International Committee Against Racism (InCAR), an organization that opposes the policies of the Klan. The defendants, James Scully and Alexander Taylor, were both residents of Willimantic at that time.[1]

Trooper Bernard DePrimo was on duty that day in the Windham-Willimantic area. He had previously

---

[1] The record does not disclose the ages of the two defendants.

monitored three other Klan rallies,[2] and he and his part-ner had been assigned to conduct a surveillance of a street demonstration on this particular day. Both offi-cers wore plain clothes and were operating undercover in an unmarked green, two-door Ford LTD automobile.

Early in the afternoon, DePrimo was in Willimantic in his parked vehicle observing an InCAR demonstra-tion that preceded an anti-Klan march to Windham. At approximately 1:15 p.m., the defendants, in a red Ford Mustang automobile, pulled up alongside DePrimo who saw Taylor take his photograph with a camera, giggle and look at him in a "funny way." DePrimo claimed that, because of the glare on the windshield, he was unable to identify the Mustang's driver, Scully.[3] After photographing DePrimo,[4] who at the time was alone in the unmarked police vehicle, the defendants drove away.

Approximately fifteen minutes later, DePrimo, who had then picked up his partner, proceeded in the unmarked automobile on a street described as running parallel to the InCAR march route. He then noticed through his rear-view mirror the same Mustang occupied by the defendants behind him on Route 32. After traveling about an eighth of a mile,[5] the two vehi-

[2] These rallies occurred in: Scotland, Connecticut, in September, 1980; Meriden in March, 1981; and again Meriden in July, 1981. In each of these instances, InCAR carried out anti-Klan demonstrations.

[3] Trooper DePrimo testified in the suppression hearing that he had known the defendant Scully to be an anti-Klan agitator. During the July, 1981 Meriden Klan rally, according to DePrimo, Scully, who had been deliver-ing an anti-Klan speech, recognized DePrimo as a police officer and then allegedly agitated some in the crowd against DePrimo to the point at which they threw stones at his police car. Scully allegedly then began "cheering." No arrests were ever made in connection with this incident. See footnote 10, infra.

[4] In the course of their surveillance, DePrimo and his partner were also photographing the events at the rally.

[5] The direction of travel by the two vehicles could have led them to any one of three locations: the announced location of the conclusion of the anti-

cles arrived at a traffic light at the intersection of Routes 32 and 6. While stopped at the light, DePrimo looked again in his rear-view mirror and observed the defendants in their car, according to his testimony, making gestures and pointing. These gestures were described by him as neither obscene nor anything "too dramatic."

While the light was still red, DePrimo exited from his vehicle intending to arrest both defendants for breach of the peace. While approaching the defendants' vehicle, which was stopped at the light behind the troopers' car in the line of traffic, DePrimo held out his badge in one hand and placed his other hand on his undrawn gun. When DePrimo reached the defendants' vehicle, he then noticed for the first time a gun butt sticking out from between the front bucket seats into the rear of the Mustang and a steel bar in the back seat. He then ordered the defendants to pull into an adjacent convenience store parking lot, which they did. Prior to observing these items in the defendants' vehicle, DePrimo had not informed them that they were under arrest.

After Scully had complied with DePrimo's order and pulled the Mustang off the road, DePrimo and his partner had the defendants get out of their vehicle, searched them, and placed them under arrest.[6] The pat down

Klan rally; or the Windham Center School, which was the headquarters established for state police activity on that day to monitor the proceedings; or the picnic area where the Klan had scheduled its rally. At oral argument, the defense counsel also suggested the possibility that the defendants, both Willimantic residents who were driving in their own hometown, could have merely been returning to their residences.

[6] The state makes no allegation that the defendants resisted the detention, arrest, and search and seizure, nor does it claim that the defendants were in any way abusive to the arresting officers. In fact, DePrimo testified that "they were very cooperative" and that "[t]hey were gentlemen throughout the encounter."

search of the defendants uncovered 20-gauge shotgun shells and .22 calibre rifle shells on both defendants. The officers then searched the defendants' vehicle and found and seized therefrom a rusted eighteen-inch steel bar with a large nut rusted on the end of it, an unloaded 20-gauge shotgun positioned as stated above, an unloaded .22 calibre rifle on the floor of the back seat, two chains approximately two feet long in a plastic bag under the driver's seat, additional ammunition, a comb, a walkie-talkie, and Taylor's medical prescriptions.

The defendants were charged by information with breach of the peace in violation of General Statutes § 53a-181[7] and possession of a dangerous weapon in violation of General Statutes § 29-38.[8] The defendants, pursuant to § 54-33f and our Practice Book rules,[9]

---

[7] "[General Statutes] Sec. 53a-181. BREACH OF PEACE: CLASS B MIS-DEMEANOR. (a) A person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or his property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public, hazardous or physically offensive condition by any act which he is not licensed or privileged to do.

"(b) Breach of peace is a class B misdemeanor."

[8] "[General Statutes] Sec. 29-38. WEAPONS IN VEHICLES. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon,' as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles or stiletto or any knife, the edged portion of the blade of which is four inches or over in length."

[9] See Practice Book §§ 821, 822, 824 through 826.

moved for the suppression and return of the evidence arguing it was illegally seized.

A suppression hearing was held at which DePrimo was the sole witness. The trial court granted the motion to suppress on the grounds that: the arrest for breach of peace was without probable cause, and hence illegal; the evidence confiscated during the search was therefore "fruit of the poisonous tree" and properly suppressed; and even if the search were legal, these items seized were neither deadly nor dangerous weapons within the purview of § 29-38. Moreover, the court did not find credible DePrimo's testimony regarding his stated reasons for approaching the defendants' vehicle.[10] The trial court, upon the state's request, dismissed the informations with prejudice in order to allow the state to appeal these rulings. See *State* v. *Ross,* 189 Conn. 42, 454 A.2d 266 (1983).

On appeal, the state does not contend that probable cause existed to arrest the defendants at the time DePrimo exited his vehicle to approach them. Nor does the state contend that these defendants in their vehicle were "stopped pursuant to a practice embodying neutral criteria." *Brown* v. *Texas,* 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). The state instead claims the trial court erred in granting the motion to suppress in that the trooper properly detained the automobile and its occupants in order to conduct an inves-

[10] On this point, the trial court stated: "It is further found that the testimony of Trooper DePrimo, that he was concerned about what the Defendants might do to him and his stated fear of their intentions, is not credible. It is found, from the testimony, that the gestures were not threatening in nature, nor were they obscene, or tumultuous."

Later, in its decision, the trial court said: "Since there is absolutely no credible testimony supporting either the intent portion, or any of the proscribed conduct subsections, there is no basis for the arrest; nor is there any basis to find a good faith belief that such arrest for Breach of Peace was warranted. Since the arrest was illegal, the search of the car was also illegal under the time honored 'fruit of the [poisonous] tree' doctrine."

tigative stop and thus the search and seizure were justified and legal. We do not agree and hold that there were insufficient grounds in this case to justify an investigative stop.[11]

The fourth amendment as applied through the fourteenth amendment to the federal constitution and article first, § 7, of the Connecticut constitution apply to searches and seizures of the person and things, including investigatory stops of an automobile as occurred here. *United States* v. *Cortez,* 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), reh. denied, 455 U.S. 1008, 102 S. Ct. 1648, 71 L. Ed. 2d 877 (1982); *Delaware* v. *Prouse,* 440 U.S. 648, 654, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *State* v. *Watson,* 165 Conn. 577, 583–84, 345 A.2d 532 (1973). "An investigatory stop must be justified by some objective manifestation that the person stopped *is,* or *is about to be,* engaged in criminal activity." (Emphasis added.) (Citations omitted.) *United States* v. *Cortez,* supra, 417; see *State* v. *Cardinal,* 194 Conn. 114, 117, 478 A.2d 610 (1984); *State* v. *Januszewski,* 182 Conn. 142, 148–49, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Watson,* supra, 584–85. "Based upon the whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez,* supra, 417–18;[12]

---

[11] Although our decision relies in part on rights guaranteed under the fourth and fourteenth amendments to the United States constitution; see *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961); it has an independent basis in article first, § 7, of the Connecticut constitution. See *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *Gaines* v. *Manson,* 194 Conn. 510, 528 n.15, 481 A.2d 1084 (1984); *State* v. *Cohane,* 193 Conn. 474, 498–99 n.19, 479 A.2d 763, cert. denied, 469 U.S.   , 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984).

[12] Although *United States* v. *Cortez,* 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), reh. denied, 455 U.S. 1008, 102 S. Ct. 1648, 71 L. Ed. 2d 877 (1982), was a border patrol case, it involved the stopping of a motor

see also *Brown* v. *Texas,* supra, 51; *State* v. *Januszewski,* supra; *State* v. *Watson,* supra, 585. "The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances . . . [which second,] must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States* v. *Cortez,* supra, 418; see *State* v. *Januszewski,* supra. We also have repeatedly stated that a police officer's decision to make such an investigatory stop must be predicated "on more than a mere hunch." *State* v. *Januszewski,* supra, 149; see also *State* v. *Acklin,* 171 Conn. 105, 111, 368 A.2d 212 (1976); *State* v. *Watson,* supra, 585. With this guidance, we examine the relevant circumstances involved in the present case in conjunction with the crimes charged.

On the day in question, the state police officers involved in this incident were assigned to a detail monitoring Klan and anti-Klan activities. On the basis of prior incidents, these officers could have reasonably been concerned about the potential for acts of civil disobedience or involving violence. At the time when these defendants were "stopped," however, there had been, at least on their part, no "objective manifestation" of involvement in any criminal activity. *United States* v. *Cortez,* supra, 417; *United States* v. *Nargi,* 732 F.2d 1102, 1105 (2d Cir. 1984). The defendants had pho-

---

vehicle used in the offense of transporting illegal aliens. The United States Supreme Court granted certiorari "to consider whether objective facts and circumstantial evidence suggesting that a particular vehicle is involved in criminal activity may provide a sufficient basis to justify an investigative stop of that vehicle." Id., 412–13. Writing for the court, Chief Justice Burger elucidated in *Cortez* the standards for determining the reasonableness of an investigatory stop made under the authority of *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). See 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (Sup. 1984) § 9.21, p. 2.

tographed DePrimo, who had been dressed in plain clothes, sitting in his unmarked car and then had driven away; while perhaps such an act did not involve the use of the soundest judgment by the defendants, in and of itself it certainly did not constitute criminal activity. The officers never made any claim or arrest on the basis that the defendants were interfering with them in the performance of their police duties. See General Statutes § 53a-167a. The defendants had at some time later, after having disappeared from DePrimo's view, appeared behind his unmarked vehicle, and, while stopped in traffic behind DePrimo's vehicle, they made nonobscene, undramatic hand gestures in the direction of DePrimo's vehicle. Cf. General Statutes § 53a-181 (a), footnote 7, supra. Even if we assume the accuracy of DePrimo's testimony regarding his prior experience with the defendant Scully at a prior rally involving the Klan and anti-Klan demonstrators, these acts, viewed as a whole, do not raise a reasonable suspicion, within the meaning of *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and its progeny, that the defendants were engaged in any criminal activity. The actions of these defendants in their own hometown were open. They in no way constituted a breach of the peace within the meaning of § 53a-181 as the trial court correctly concluded.

Nor were any of the putative "weapons" observed by these troopers prior to the actual stop of the defendants by them. Accordingly, and as the trial court noted, when DePrimo first observed the gun butt, he had no valid reason under the circumstances to be situated where he could so view it. Moreover, even if DePrimo did have valid reason to do so, both charges against the defendants were unwarranted. As stated, no breach of peace had occurred; nor was § 29-38 violated. Section 29-38 specifies those items that are prohibited to be in a motor vehicle in the absence of a permit. The

sole possibly relevant item of those enumerated in that provision is that the items seized were "any other dangerous or deadly weapon[s]." General Statutes § 29-38. Under our statutes, an unloaded rifle and shotgun are not per se deadly weapons, and as the trial court also noted, the state tacitly admitted such by not charging these defendants under § 53-206.[13]

---

[13] General Statutes § 53-206 (a) provides: "Any person who carries upon his person any slung shot, air rifle, BB. gun, blackjack, sand bag, metal or brass knuckles, or any dirk knife, or a switch knife, or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, or stiletto, or any knife the edged portion of the blade of which is four inches or over in length, or any other dangerous or deadly weapon or instrument, unless such person has been granted a written permit issued and signed by the first selectman of a town, the mayor or chief of police of a city or the warden of a borough, authorizing such person to carry such weapon or instrument within such town, city or borough, shall be fined not more than five hundred dollars or imprisoned not more than three years or both. No permit shall be issued to any applicant who has ever been convicted of a felony. The issuing authority may request the applicant's fingerprints and full information concerning his criminal record and make an investigation concerning the suitability of the applicant to carry any such weapon. Refusal of fingerprinting by the applicant shall be sufficient cause to refuse issuance of a permit. Whenever any person is found guilty of a violation of this subsection, any weapon or other implement within the provisions hereof, found upon the body of such person, shall be forfeited to the municipality wherein such person was apprehended, notwithstanding any failure of the judgment of conviction to expressly impose such forfeiture. The provisions of this subsection shall not apply to any officer charged with the preservation of the public peace nor to any person who is found with any such weapon or implement concealed upon his person while lawfully removing his household goods or effects from one place to another, or from one residence to another, nor to any person while actually and peaceably engaged in carrying any such weapon or implement from his place of abode or business to a place or person where or by whom such weapon or implement is to be repaired, or while actually and peaceably returning to his place of abode or business with such weapon or implement after the same has been repaired."

In addition, § 53-205 provides in part: "No person shall carry or possess in any vehicle or snowmobile any shotgun or rifle or muzzleloader of any gauge or caliber while such shotgun or rifle or muzzleloader contains in the barrel, chamber or magazine any loaded shell or cartridge capable of

In addition, no item seized by the state from the defendants' vehicle under these circumstances could be characterized as a "dangerous instrument" as defined in § 53a-3 (7),[14] which requires "circumstances in which it is used or attempted or threatened to be used . . . . " Such "circumstances" were not present, however, and in the words of the trial court: "From the testimony, there is no use or attempted use, nor even any threatened use [of the items seized]. In fact, Trooper DePrimo described the Defendants as being gentlemen throughout the encounter. A citizens band walkie-talkie radio, film, chains, etc. are common, everyday possessions which anyone is allowed to transport in their [sic] motor vehicle without subjecting themselves to arrest absent something more. There is nothing more here."

In sum, on this record, there were no grounds for the arrests, and the defendants' actions that culminated in the investigatory stop by these troopers, viewed either singly or cumulatively, did not constitutionally justify the police intrusion in the present case.[15] While

being discharged or when such muzzleloader has a percussion cap in place or when the powder pan of a flint lock contains powder."

General Statutes § 53a-3 (6) defines a "deadly weapon" in part as "any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ." That definition, however, expressly exempts §§ 29-38 and 53-206 from its application. In other words, the unloaded rifle or shotgun cannot be deemed per se "deadly weapons" when transported in a motor vehicle; otherwise, even those with legitimate reasons for possessing an unloaded firearm in a motor vehicle, e.g., a hunter, would fall within the sweep of those provisions.

[14] General Statutes § 53a-3 (7) provides: " 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury, and includes a 'vehicle' as that term is defined in this section . . . ." Unlike § 53a-3 (6), §§ 29-38 and 53-206 are not expressly exempted from this definition. See footnote 13, supra.

[15] Compare *Brown* v. *Texas,* 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) (Burger, C.J.), in which direct observation by two police officers of both the defendant, who "looked suspicious" and had never been seen by them before, and another man walking from an alley in an area

the record "suggests an understandable desire to assert a police presence . . . that purpose does not negate Fourth Amendment guarantees." *Brown* v. *Texas,* supra, 52. The same rationale applies on this record in applying article first, § 7, of the Connecticut constitution. We must recognize that "[t]he needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez* v. *United States,* 413 U.S. 266, 273, 93 S. Ct. 2535, 37 L. Ed. 2d 596 (1973).

There is no error.

In this opinion PETERS, C. J., ASPELL and BRENNAN, Js., concurred.

SHEA, J., concurring. I disagree with the portion of the majority opinion that concludes that the investigative stop of the defendants' vehicle was improper, but I agree that the ensuing arrest and seizure were illegal for lack of probable cause. In my judgment the opinion focuses too narrowly upon the crime-detection function of the police and gives insufficient consideration to their crime-prevention function. "The assumption that the use of an arrest and the criminal process is the primary or even exclusive method available to police should be recognized as causing unnecessary distortion of both the criminal law and the system of crimi-

---

of town known for a "high incidence of drug traffic" did not constitute reasonable suspicion sufficient for a justifiable investigative stop. In *Brown,* the officers did not suspect the defendant of any specific misconduct, nor did they have reason to believe that he was armed. The *Brown* court stated that the defendant's "activity was no different from the activity of any other pedestrians in that neighborhood." Id., 52. The lesson from *Brown* v. *Texas* is simply that physical presence in a geographical area where the police may have reason to anticipate possible violations of the law does not in and of itself justify arbitrary investigatory stops.

nal justice." A.B.A. Standards for Criminal Justice, Urban Police Function, 1-3.2. "Among other methods police use are, for example, the process of informal resolution of conflict, referral, and warning. The alternative methods used by police should be recognized as important and warranting improvement in number and effectiveness; and the police should be given the necessary authority and resources to use them under circumstances in which it is desirable to do so." Id., 1-3.1. The limited detention involved in a car stop was a reasonable measure for averting the serious risk of violent crime presented by the circumstances of this case.

The action of Officer DePrimo in stopping the defendants' automobile was taken in the highly charged atmosphere of attempting to avert a violent confrontation between the Ku Klux Klan and an organization, the International Committee Against Racism (InCAR), several of whose members and adherents had assaulted Klan supporters on previous similar occasions in Scotland and in Meriden. Only three months before, in July, 1981, at a Klan rally in Meriden, DePrimo had observed Scully making a speech to InCAR supporters in which he advocated that they should "go after" the Klan, vilified DePrimo upon recognizing him as a police officer, and cheered youths who then began to stone the officer's car.

On the present occasion, October 10, 1981, the defendants must have recognized DePrimo as he was parked observing the InCAR demonstration in Willimantic, because they photographed him. When the InCAR rally began to march from Willimantic to Windham, apparently for the purpose of confronting the Klan, which was holding a rally in Windham, the defendants' vehicle followed DePrimo and his partner as they proceeded on Route 32. DePrimo received a radio message that a gang of InCAR people had assaulted some person, seriously injuring him. At the

red light the defendant Scully was observed making provocative gestures toward the officers. In my judgment these circumstances would reasonably lead a prudent police offficer "to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry* v. *Ohio,* 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

"It is fair to say that the argument the police must have some additional power to make seizures beyond that conferred by the pre-*Terry* law of arrest is most compelling when stated in terms of the crime-prevention function." 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2 (a), p. 19. The information known to Officer DePrimo—the recent incident in which Scully had fomented violence on a similar occasion in Meriden; the bizarre behavior of the defendants on this occasion in maintaining a surveillance of the officers which might well have interfered with their ability to perform their duties in connection with this highly dangerous situation; the actual onset of violence on the part of other supporters of InCAR resulting in serious injuries—warranted the brief detention involved in a car stop for the purpose of averting or thwarting a risk of serious violence. The judgment of DePrimo as to the serious potential of the defendants for violence on this occasion was clearly vindicated by the small arsenal of weapons found in the defendants' car as a result of the stop and ensuing search.

I agree, nevertheless, that the mere presence of these weapons in a motor vehicle does not constitute a crime under the laws of this state and that the circumstances fall short of probable cause to believe that the defendants had committed any crime at the time of the arrest. Accordingly, the motion to suppress was properly granted as well as the motion to dismiss which followed.