******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KYLE PETERSON
(SC 19414)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued November 3, 2015—officially released March 15, 2016*

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *Christian Watson*, assistant state's attorney, for the appellant (state).

*Jon L. Schoenhorn*, with whom, on the brief, was *Irene J. Kim*, for the appellee (defendant).

*Opinion*

ROGERS, C. J. The principal issue in this case is whether, under the totality of the circumstances, the police possessed a reasonable and articulable suspicion to detain the defendant, Kyle Peterson. After the defendant's motion to suppress was denied, the defendant entered a conditional plea of nolo contendere, pursuant to General Statutes § 54-94a,[1] to possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (b). The trial court thereafter rendered judgment in accordance with the defendant's plea and sentenced him to three years imprisonment. The state appeals from the judgment of the Appellate Court reversing the judgment of the trial court and remanding the case with direction to vacate the conditional plea of nolo contendere and to grant the defendant's motion to suppress, after the Appellate Court concluded that the police did not possess a reasonable and articulable suspicion that "criminal activity was afoot . . . ." *State* v. *Peterson*, 153 Conn. App. 358, 376, 101 A.3d 337 (2014). The state argues that, under the totality of the circumstances, the police had a reasonable and articulable suspicion to detain the defendant outside a known drug location where the defendant had acted in a manner consistent with drug activity once before. We agree and, accordingly, reverse the judgment of the Appellate Court.

The trial court's findings and the record reveal the following undisputed facts and procedural background relevant to this appeal. "On March 10, 2010, officers of the New Britain Police Department were conducting surveillance [of] the residence of Pedro Ayala, a suspected marijuana trafficker. On the same date, the police observed the defendant arrive at Ayala's residence in a Jeep Cherokee, stay for approximately five minutes, and then leave. Once the defendant left Ayala's residence in his vehicle, the police stopped him, searched him, and discovered $4000 in cash on his person. Thereafter, on March 23, 2010, the police executed a search warrant on Ayala's residence and discovered more than two pounds of marijuana, a firearm, and what the police described as 'drug proceeds.' The police arrested Ayala who, in turn, told the police that the defendant was one of his several sources of marijuana and [that], on March 10, 2010, he had paid the defendant $4000 in cash for marijuana.

"Approximately six months later, on September 29, 2010, the police arrested Eric Cedeno for the sale of marijuana. While in police custody, Cedeno told Officer Joseph Lopa that he regularly purchased marijuana from an individual named Kyle Peterson, whom Cedeno described as a twenty-five year old male who drove two different Jeep Cherokees. Lopa, on the basis of past investigations involving the defendant, corroborated that Cedeno was describing the defendant.

"On the basis of the information received from Ayala and Cedeno that the defendant was selling marijuana in large quantities, the police began conducting surveillance of the defendant's New Britain residence in early October, 2010. In the course of their surveillance, the police observed the defendant make a single trip to 33 Thorniley Street . . . ." Id., 361–62. During that trip, at 33 Thorniley Street, a three-story, multifamily residence in New Britain, the police observed the defendant "park in the driveway, enter the residence for approximately five minutes, and then leave." Id., 362. Just before this observation, on October 7, 2010, "the police arrested Leonardo Soares, a registered confidential informant for the Federal Drug Enforcement Administration, for the illegal possession of prescription drugs. Soares told the police that he had purchased marijuana from an unidentified male living on the third floor of 33 Thorniley Street." Id. Soares said that he had been inside the third floor apartment several times in the past and had witnessed several pounds of marijuana and a large quantity of cash. Id. "On the basis of this information, as well as information previously obtained from Ayala corroborating that the defendant's March, 2010 visit to Ayala's residence involved the sale of marijuana, the police believed that the defendant's October, 2010 visit to 33 Thorniley Street, insofar as the defendant quickly entered and exited the residence, was consistent with drug activity." Id.

The following week, "[o]n October 13, 2010, Lopa contacted Adrian Arocho, a registered confidential informant for the police who had previously provided reliable information, and requested that he make a controlled purchase of marijuana from the defendant. In addition to agreeing to make the controlled purchase, Arocho indicated that he was familiar with the defendant and knew that the defendant sells marijuana. Lopa provided Arocho with a telephone number that he received from Cedeno. With Lopa seated next to him and the speakerphone activated, Arocho called the number from his cell phone. When an individual answered his call, Arocho told the individual that he wanted to purchase marijuana but his usual supplier, Cedeno, did not have any. The individual responded that he had recently 'set up' Cedeno and that he would call Arocho back. Lopa, who was familiar with the defendant's voice, confirmed that the individual to whom Arocho was speaking was the defendant. Approximately two minutes after that call ended, the defendant called Arocho back and told him never to call again.

"On October 20, 2010, at approximately 1 p.m., Officer Michael Farrell was conducting surveillance of the defendant's residence when he observed the defendant depart the residence in his vehicle with a white, weighted plastic bag in his possession. Farrell con-

tacted Sergeant Jerry Chrostowski via radio to inform him of his observations. Chrostowski, who was conducting patrol in an unmarked police vehicle, followed the defendant to Thorniley Street in New Britain. When Chrostowski turned on to Thorniley Street, he observed the defendant's vehicle enter the driveway of 33 Thorniley Street and come to a stop. At that point, Chrostowski observed the defendant, from his vehicle's driver's seat, begin speaking to an individual unknown to the police through his passenger side window.

"On the basis of the information obtained by the police prior to October 20, 2010, as well as Farrell's observation of the defendant carrying a white, 'weighted' plastic bag out of his residence, Chrostowski 'believed that [the defendant] was making a [marijuana] delivery to . . . [33 Thorniley Street].' Chrostowski subsequently drove his vehicle into the driveway of 33 Thorniley Street, blocking in the defendant's vehicle from the rear. Chrostowski exited his vehicle, approached the passenger side of the defendant's vehicle, identified himself as a police officer, and instructed the defendant to turn off his engine. Lopa, who arrived at 33 Thorniley Street shortly after Chrostowski exited his vehicle, approached the driver's side of the defendant's vehicle, ordered the defendant to exit the vehicle, and conducted a patdown search of the defendant's person. After Lopa completed his patdown search, he handcuffed the defendant and ordered him to [stand by] the rear of the vehicle." Id., 363–64. The trial court noted in its memorandum of decision that "Lopa, while still outside the defendant's vehicle, gazed into the rear of the vehicle through the open front driver's door and saw in plain view on the floor behind the front passenger's seat a ziplock bag sitting on top of a white plastic bag. The ziplock bag appeared to contain marijuana." (Footnote omitted.) Chrostowski then searched the defendant's vehicle and seized the plastic bag, which contained two ziplock bags. *State* v. *Peterson*, supra, 153 Conn. App. 364. "Following a field test, the substance was confirmed to be marijuana and the police placed the defendant under arrest." Id.

"Prior to trial, the defendant moved to suppress evidence seized from his vehicle, claiming, inter alia, that the police did not possess a reasonable and articulable suspicion that he was engaged in or about to engage in criminal activity when Chrostowski entered the driveway of 33 Thorniley Street. Following a suppression hearing, in its memorandum of decision dated August 23, 2012, the trial court denied the defendant's motion to suppress. In its decision, the court stated: Armed with [the] information [from Ayala, Cedeno, Arocho, and Soares] when the police observed the defendant leave his residence with a weighted white bag and travel in his vehicle to 33 Thorniley Street on October 20, 2010, they had a particularized and objective basis for suspecting the defendant of criminal activity; specifi-

cally the delivery of marijuana to 33 Thorniley Street. Accordingly, the police had an appropriate basis to stop the defendant, by blocking his vehicle, after he entered the driveway of 33 Thorniley Street and investigate further.

"Following the court's denial of his motion to suppress, the defendant entered a conditional plea of nolo contendere, pursuant to . . . § 54-94a, to one count of possession of a controlled substance with intent to sell in violation of § 21a-277 (b). The court accepted the defendant's plea and sentenced him to a total effective sentence of three years imprisonment followed by three years of probation." (Footnote omitted; internal quotation marks omitted.) Id., 364–65.

On appeal to the Appellate Court, the defendant argued, inter alia, that the trial court improperly denied his motion to suppress because the police lacked a reasonable and articulable suspicion that he was engaged in or about to engage in criminal activity when Chrostowski detained him in the driveway of 33 Thorniley Street.[2] Id., 367. Specifically, the defendant contended there were no contemporaneous facts indicating that he was engaged in or about to engage in criminal activity on October 20, 2010. Id. The defendant argued that "the police did not have a specific and individualized basis to suspect that either (1) the white plastic bag he carried out of his residence contained marijuana or (2) he traveled to 33 Thorniley Street for the purpose of delivering marijuana." Id. A majority of the Appellate Court agreed and concluded that "[t]he presence of a known drug dealer with a plastic bag at a location where he is believed to have previously delivered drugs once before, without more, is insufficient to particularize the general suspicion the police harbored with respect to the defendant on October 20, 2010." Id., 375. The Appellate Court stated in its opinion that "[w]ithout information or observations that would have particularized their general suspicion that the defendant was delivering marijuana to 33 Thorniley Street on October 20, 2010 . . . any suspicion of ongoing crime was necessarily founded in conjecture or the police's subjective notions of the defendant's propensity to engage in criminal behavior. . . . Whatever the basis of Chrostowski's conclusion that the defendant was transporting marijuana to 33 Thorniley Street on October 20, 2010, [the Appellate Court's] review of the record . . . revealed that it could not have been more than a hunch. For that reason, [it] conclude[d] that the [trial] court's determination that the police possessed a reasonable and articulable suspicion that criminal activity was afoot when they detained the defendant on October 20, 2010, was legally and logically incorrect." (Citation omitted.) Id., 375–76. Accordingly, the Appellate Court reversed the judgment of the trial court. Id., 377. This appeal followed.[3]

We first address the proper standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008). "[T]he trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 74, 779 A.2d 88 (2001).

The law governing investigatory detentions is also well settled. "Under the fourth amendment to the United States constitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion."[4] (Citations omitted; internal quotation marks omitted.) Id., 75.

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Lipscomb*, supra, 258 Conn. 75. "[A]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 76. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (Internal quotation marks omitted.) *United States* v. *Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); *State* v. *Nash*, 278 Conn. 620, 635, 899 A.2d 1 (2006) ("law enforcement officials are trained to cull

significance from behavior that would appear innocent to the untrained observer" [internal quotation marks omitted]).

Consequently, "[w]e do not consider whether the defendant's conduct possibly was consistent with innocent activity but, rather, whether the rational inferences that can be derived from it reasonably suggest criminal activity to a police officer." *State* v. *Madison*, 116 Conn. App. 327, 336, 976 A.2d 15, cert. denied, 293 Conn. 929, 980 A.2d 916 (2009), citing *State* v. *Lipscomb*, supra, 258 Conn. 75–76, and *State* v. *Trine*, 236 Conn. 216, 230–31, 673 A.2d 1098 (1996). "When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." *State* v. *Lipscomb*, supra, 76.

On appeal, the defendant does not challenge the underlying factual findings for clear error. Accordingly, the only issue before this court is whether the trial court's conclusion that there was a reasonable and articulable suspicion for the defendant's detention was legally and logically correct.

The defendant's primary claims are that there is no evidence to suggest that the police observation that the plastic bag was weighted meant anything more than the " 'opposite of empty' " and that the state entirely dismisses the temporal requirement that criminal activity must be "afoot." The Appellate Court majority agreed, and in support of its decision stated: "The record does not reveal any particularized basis upon which Chrostowski could have associated the defendant's apparently innocuous conduct in the driveway of 33 Thorniley Street *on that day* with drug activity. . . . Thus, we fail to perceive what specific and individualized factors, if any, led Chrostowski to conclude that the plastic bag in the defendant's vehicle contained marijuana. Indeed, absent any observations of conduct consistent with drug activity, or specific and individualized information suggesting that the defendant's mere presence at 33 Thorniley Street with a plastic bag in his possession gave rise to a reasonable suspicion that he was there to effectuate a drug transaction, Chrostowski not only did not, but could not have known what, if anything, the defendant was doing there on October 20, 2010, aside from talking to someone." (Emphasis in original.) *State* v. *Peterson*, supra, 153 Conn. App. 373–74.

The flaw in the Appellate Court majority's analysis as to whether the police had a reasonable and articulable suspicion is that it focuses only on the defendant's activities on October 20, 2010, and fails to take into account all of the specific information available to the police on that date and the rational inferences that could be drawn from such information. See *State* v. *Lipscomb*, supra, 258 Conn. 76 ("a court must consider

if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity"). Moreover, "[w]e do not consider whether the defendant's conduct possibly was consistent with innocent activity . . . ." *State* v. *Madison*, supra, 116 Conn. App. 336.

In the present case, the defendant was known to police because they had corroborated the claim by Ayala, another marijuana trafficker, that he had purchased $4000 of marijuana on March 10, 2010, from the defendant at Ayala's home because they had stopped the defendant that day and found that precise amount of cash in his possession. Additionally, another informant had recently identified the defendant as a person from whom he regularly purchased marijuana. The defendant also had already been observed earlier in the month engaging in conduct consistent with drug activity at 33 Thorniley Street, a location where police had information that large amounts of marijuana and cash were being stored. Finally, the police had the defendant's recent incriminating statement that he had delivered marijuana to another drug dealer, which corroborated the information from multiple reliable informants that they bought marijuana from the defendant.

Against this factual background, the issue "is not whether the particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *United States* v. *Sokolow*, 490 U.S. 1, 10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Although the defendant was still parked in the driveway of 33 Thorniley Street when the police detained him, based on the totality of the information available to the police that he was an admitted marijuana trafficker, carrying a weighted plastic bag,[5] and had pulled into the driveway of a drug location where police had seen him recently engage in conduct consistent with drug activity, it was not logically and legally incorrect for the trial court to find that the police had a reasonable and articulable suspicion that the defendant was there to deliver drugs and that the plastic bag did not contain innocuous items.

The defendant's contention that there were no particularized facts that would indicate any ongoing crime at 33 Thorniley Street is not supported by the record or the trial court's findings. While it is well settled that an individual's mere presence at a location known for criminal activity is not sufficient, without more, to support a reasonable suspicion; *Brown* v. *Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *State* v. *Scully*, 195 Conn. 668, 678–79 n.15, 490 A.2d 984 (1985); the individual's presence in such a location can be a relevant articulable fact in the *Terry* reasonable suspicion calculus. *State* v. *Nash*, supra, 278 Conn. 634; *State* v. *Moreland*, 23 Conn. App. 495, 497, 582 A.2d 212 (1990).

The record in this case, however, demonstrates that the defendant was not stopped just because he happened to be in the wrong place at the wrong time. He also was not stopped merely because he was known to have sold drugs in the past. Rather, the trial court specifically found, relying on Soares' information,[6] that there was a suspicion of ongoing criminal activity at 33 Thorniley Street by noting in its memorandum of decision that "the police had information that 33 Thorniley Street was an address where large amounts of marijuana and cash were stored."[7] Even the Appellate Court majority recognized that this information, along with the fact that the defendant's actions at 33 Thorniley Street were also consistent with his previous drug transaction at Ayala's home, meant that "the police were not only entitled to lend some degree of credence to the information from Soares . . . but they reasonably could have inferred that the defendant may have sold marijuana to someone living at 33 Thorniley Street when he visited the residence in early October, 2010." *State* v. *Peterson*, supra, 153 Conn. App. 372.

Finally, the Appellate Court majority in reaching its decision relied heavily on a lack of overt drug activity on October 20, 2010. See id. Although the temporal element, or contemporaneous observation, is an important factor in determining reasonable and articulable suspicion; id., 375 (and cases cited therein); it is not the only factor that can lead to a determination that criminal activity was afoot. See *State* v. *Groomes*, 232 Conn. 455, 467–68, 656 A.2d 646 (1995) ("police may detain an individual for investigative purposes if there is a reasonable and articulable suspicion that the individual is engaged in or *about to engage in* criminal activity" [emphasis added]). Farrell, the officer who had been conducting surveillance of the defendant's residence in New Britain in early October, 2010, testified that the defendant used both of his Jeeps to travel to and from his residence approximately thirty to forty times in the span of one week. Chrostkowski testified that, during that time, other officers would rely on Farrell's surveillance and use unmarked vehicles to follow the defendant to other residences in New Britain, including his father's home, where they would observe him engage in activity consistent with drug-related transactions, in particular making quick stops and leaving after less than ten minutes after meeting someone who had been waiting for him in a parked car. Indeed, as Judge Bear noted in his dissenting opinion, the defendant's own incriminating statement one week earlier about delivering marijuana to another drug dealer provided a foundation for the rational inference that he was there to deliver drugs on the day of his arrest. See *State* v. *Peterson*, supra, 153 Conn. App. 386 n.6 (*Bear, J.*, dissenting) ("[the defendant's] October 13 admission to resupplying Cedeno with marijuana, and the common knowledge that selling illegal drugs is a regenerating

activity . . . alone supported the inference that the defendant was actively engaged in selling marijuana one week later" [citation omitted; internal quotation marks omitted]). This statement in addition to all the information police possessed about the defendant when he entered the driveway of 33 Thorniley Street with a weighted plastic bag were facts that allowed a rational inference to be drawn that the defendant was at the location to deliver drugs contained in that plastic bag that day. The police can make a minimally intrusive inquiry to find out if such a delivery was about to occur and, in this case, did not have to wait for the defendant to exit his vehicle and deliver the drugs. See *State* v. *Lipscomb*, supra, 258 Conn. 76 ("A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . . [A]n investigative stop can be appropriate even where the police have not observed a violation . . . ." [Citations omitted; internal quotation marks omitted.]).

"In conducting our review, we recognize that the trial court is given great deference in its fact-finding function because it is in the unique [position] to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Internal quotation marks omitted.) Id., 74. While the line can be close between a good hunch and a reasonable and articulable suspicion, in the present case, the trial court's findings regarding the information the police possessed before the stop allowed a rational inference to be drawn that the defendant was at 33 Thorniley Street to deliver drugs. The trial court's conclusions were therefore legally and logically consistent with the facts and, under the totality of the circumstances, we agree that the police possessed a reasonable and articulable suspicion to detain the defendant.

The defendant claims in the alternative that, even assuming the police had the authority to detain him, the police exceeded the permissible scope of a *Terry* stop when they directed him to exit his vehicle, which afforded the police a plain view of the marijuana located in his vehicle. This claim is meritless. As the trial court observed: "It was . . . reasonable for Officer Lopa to ask the defendant to exit his vehicle during the investigatory stop. . . . Such a step was reasonably related to the need to protect the safety of the police officer. Officer Lopa was approaching a person he knew to traffic in large quantities of marijuana and cash. Accordingly, it was reasonable to suspect that the defendant might be armed to safeguard the drugs and the cash. In addition, police face 'inordinate risk' approaching a person seated in an automobile. *Pennsylvania* v. *Mimms*, 434 U.S. 106, 110 [98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)]. This concern for officer safety outweighed

the 'de minimis' intrusion into the driver's personal liberty by ordering him out of the vehicle. Id., 111. See also *State* v. *Dukes*, 209 Conn. 98, 122 [547 A.2d 10] (1988) ([a]ny intrusion upon an occupant's personal liberty by asking the occupant to exit a vehicle during a motor vehicle infraction stop is de minimis because it serves to protect the officer)." (Citation omitted.)

The defendant attempts to counter this logic by claiming that the trial court misapplied *Mimms* and *Dukes* because those cases are limited to stops for motor vehicle offenses committed by drivers and this was a *Terry* stop. He argues that in the *Terry* stop context, the police must have a reasonable and articulable suspicion that an individual is armed and dangerous in order to frisk the individual. "[W]e agree with the defendant that the police must have a reasonable and articulable suspicion that a suspect is armed and dangerous before they may commence a protective patdown search during an investigative stop." *State* v. *Nash*, supra, 278 Conn. 633. The trial court, however, found that it was reasonable to suspect that the defendant was armed.[8] See *State* v. *Mann*, 271 Conn. 300, 325, 857 A.2d 329 (2004) ("the facts supporting the officers' reasonable suspicion that the defendant may have been involved in narcotics trafficking also gave rise to a reasonable suspicion that the defendant was armed and dangerous"), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). We conclude, then, that "it [would defy] logic to permit the policeman to order a minor traffic violator out of the car for the policeman's safety [as the United States Supreme Court held in *Pennsylvania* v. *Mimms*, supra, 434 U.S. 111] but not allow him to exercise the same precaution when making a valid [*Terry*] stop of suspected narcotics traffickers." *United States* v. *White*, 648 F.2d 29, 38–39 (D.C. Cir. 1981).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgment of the trial court.

In this opinion the other justices concurred.

[1] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress . . . would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . . A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[2] The Appellate Court declined to review the defendant's remaining claim with respect to the propriety of the trial court's denial of his motion to suppress because the Appellate Court did not perceive how the defendant's request to enunciate, as a matter of state constitutional law, the circumstances under which the police may properly order an individual from his vehicle and subject him to a physical search implicated the propriety of the denial of his motion to suppress. *State* v. *Peterson*, supra, 153 Conn. App. 366 and nn.2 and 3. Although we generally agree with the Appellate Court,

because the patdown search revealed no drugs subject to suppression and the subsequent search of the vehicle was carried out due to the plain view observation of a ziplock bag that appeared to contain marijuana, we will briefly address the defendant's alternative claim for affirmance at the end of our analysis.

[3] This court granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly determine that the totality of the circumstances did not provide sufficient reasonable and articulable suspicion for police to detain the defendant?" *State* v. *Peterson*, 314 Conn. 947, 103 A.3d 980 (2014).

[4] Reasonable and articulable suspicion is a lower standard than probable cause. *State* v. *Mann*, 271 Conn. 300, 306 n.8, 857 A.2d 329 (2004) ("[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause" [internal quotation marks omitted]), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). "Proof of probable cause requires less than proof by a preponderance of the evidence," or in other words, less than proof that something is more likely than not. (Internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 435, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008).

[5] The Appellate Court majority concluded that there was nothing in the record upon which to infer that the defendant employed plastic bags or similar items to transport marijuana or that drug dealers in general use plastic bags or that the plastic bag in the defendant's vehicle contained marijuana. *State* v. *Peterson*, supra, 153 Conn. App. 373 and n.7. In addressing this concern, the dissenting judge appropriately referenced the argument put forth by the state that the bag was suspicious, under the circumstances, due to the fact that the defendant was an active marijuana wholesaler dealing in pound quantities of the product and that the bag looked like it contained one pound or more of marijuana. Id., 380–81 n.4 (*Bear, J.*, dissenting).

[6] The Appellate Court majority took issue with the state's characterization that there was a marijuana dealer "actively operating" out of 33 Thorniley Street based solely on Soares' information, because the trial court did not make a finding of fact to that effect. (Emphasis omitted.) *State* v. *Peterson*, supra, 153 Conn. App. 370–71 n.5. As Soares did not testify at the suppression hearing, Chrostowski testified to Soares' information including that Soares "personally purchases marijuana from 33 Thorniley Street . . . ." On the basis of this testimony by Chrostowski, the trial court found that Soares " 'personally purchased' " marijuana from an individual living at 33 Thorniley Street and that, " 'several times in the past,' " Soares had been inside the third floor apartment where he witnessed " 'several pounds of marijuana and large amounts of cash.' " *State* v. *Peterson*, supra, 370 n.5. While somewhat ambiguous, based on the underlying testimony, we do not believe the state's view of the trial court's finding to be a mischaracterization. Regardless, in making its reasonable and articulable suspicion determination, the trial court simply needed to find Soares' information relevant and credible enough to indicate to police that there was ongoing criminal activity, which the trial court clearly did find by including Soares' information in its analysis. See *State* v. *Johnson*, 219 Conn. 557, 567, 594 A.2d 933 (1991) (although informant's tip alone would not have supported finding of probable cause, it did indicate ongoing drug activity that was corroborated by subsequent controlled purchase arranged by police); see also *State* v. *Mann*, supra, 271 Conn. 306 n.8 ("reasonable suspicion can arise from information that is less reliable [than that required] to show probable cause" [internal quotation marks omitted]). Furthermore, as to the defendant's contention that Soares' information was stale, the trial court would not have used this information in its reasonable and articulable suspicion analysis if it believed it was stale. See *State* v. *Batts*, 281 Conn. 682, 693, 916 A.2d 788 (2007); *State* v. *Buddhu*, 264 Conn. 449, 465–66, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004).

[7] While the facts are distinguishable, *United States* v. *Collins*, 445 Fed. Appx. 840 (6th Cir. 2011), is illustrative. In that case, the police were aware that the defendant previously had been involved in drug related activity. Id., 841. Further, an identified citizen submitted weekly complaints to law enforcement that numerous individuals entered the defendant's residence for a short period of time, often carrying bags, and the police verified this suspicious activity. Id. "When [the defendant] left his home on the day of

his arrest, he was seen *carrying a small bag*." (Emphasis added.) Id. The United States Court of Appeals for the Sixth Circuit determined that, at that point, the police officers had "an objective and particularized basis for suspecting criminal activity" and thus for attempting to stop the defendant's vehicle in his driveway. Id. Arguably, the facts in the present case are more compelling than, or at least as compelling as, those in *Collins* and, thus, justified an investigatory stop of the defendant. In *Collins*, the suspicion was based on suspicious activity observed outside of the defendant's home and his known involvement in drug related activity but not on any information regarding what was actually occurring at the location. In the present case, the police had observed suspicious activity at a house, the defendant's prior and ongoing involvement in drug activity, *and* actual information that there were large amounts of marijuana and cash being stored at the location.

[8] Although the defendant has briefed and requested that we conduct a state constitutional analysis under *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), and "hold that any removal of automobile occupants by law enforcement and subjecting them to physical searches, must be justified by individualized, reasonable and articulable suspicion that they are armed or dangerous," we decline to undertake this analysis because that determination was actually made by the trial court in the present case. See also footnote 2 of this opinion.